UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHIGAN MILLERS MUTUAL
INSURANCECOMPANY a/s/o AVON
STAR, LLC and 59 AVON, LLC,

                Plaintiff,

                                        Case No. 13-12892

v.

                                        Hon. Patrick J. Duggan

LANCER INSURANCE COMPANY,

                Defendant.

_____/

## **OPINION AND ORDER**

This case involves an insurance coverage dispute between Plaintiff Michigan Millers Mutual Insurance Company and Defendant Lancer Insurance Company in connection with a vehicle fire causing property damage.   On December 29, 2012, a fire originated in the engine compartment of a motor vehicle covered by a no fault insurance policy issued by Lancer.   The fire occurred while the vehicle, a white limousine, was parked inside of commercial space owned by a Michigan Millers' insured and leased by a Lancer insured.   The property sustained smoke and water damage from the fire.   After the fire and the subsequent submission of an insurance claim by its insured, Michigan Millers paid for the property damage. Michigan Millers then instituted this suit as subrogee of its insured, seeking to recover property protection benefits from Lancer pursuant to provisions of

Michigan's No Fault Act, specifically, Michigan Compiled Laws § 500.3121 and § 500.3125.

The matter is presently before the Court on the parties' cross motions for summary judgment filed pursuant to Federal Rule of Civil Procedure 56. Each motion has been fully briefed and the Court held oral argument on May 8, 2014. For the reasons stated herein, the Court grants Michigan Millers' Motion for Summary Judgment in part and denies Lancer's Motion for Summary Judgment on the issue of liability. Because the amount of damages has not been adequately proven, the Court denies Michigan Millers' Motion for Summary Judgment on the issue of damages and will schedule a hearing to determine the amount of damages Lancer must remit to Michigan Millers.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

Avon Star/59 Avon LLC owns commercial property located at 2231-2245 Star Court in Rochester Hills, Michigan. This property consists of a single-story structure covering 20,000 square feet, and, at the time of the events giving rise to this action, this property had multiple tenants. Michigan Millers issued Avon a commercial insurance policy for property and liability coverage for the entire structure. (Policy, Pl.'s Reply Ex. 11.)

Pete's Limousine, Inc. and Metro Party Bus jointly leased the unit with the address of 2239-2241 Star Court. (Lease, Pl.'s Mot. Ex. 2.) The leased space

included an office area and a large garage for vehicle storage.  Sometime before

11:10 AM on December 29, 2012, a fire broke out in the garage area.  (Murray

Dep. 11, Def.'s Mot. Ex. 2 (testifying at deposition that the fire department

received notice of the fire at 11:10 AM).)  Several vehicles were parked therein.

(Fire Dep't Report, Pl.'s Mot. Ex. 3.)  Among those vehicles was a white 1996

Lincoln Towncar limousine owned by Pete's Limousine and insured pursuant to a

no fault policy issued by Lancer.  (Lazareanu Aff. ¶ 2, Def.'s Mot. Ex. 1;

Certificate of Ins., Pl.'s Mot. Ex. 4.)  By all accounts, the fire originated in the

engine compartment of this limousine.  (*See, e.g.*, Murray Dep. 21-22, 23, 24, 35,

Def.'s Mot. Ex. 2; Fire Dep't Report 9, Pl.'s Mot. Ex. 3.)  The limousine's owner

replaced the vehicle's battery "approximately two weeks prior to December 29,

2012."  (Lazareanu Aff. ¶ 6, Def.'s Mot. Ex. 1.)  However, no problems occurred

during the battery installation and the vehicle's owner asserts that "there was no

problem with the . . . operation of the" limousine between the time the battery was

installed and the date of the fire.  (*Id.*)

The Rochester Hills Fire Department responded to the fire.  Lieutenant Jason

Murray, the incident commander on the scene, testified during his deposition that

by using a thermal imaging camera, he was able to observe the fire in the engine

compartment and could see the fire spreading from the engine compartment into

the passenger compartment.  (Murray Dep. 23, Def.'s Mot. Ex. 2.)  Based on this

observation, as well as the fact that the fire itself was confined to the engine and passenger compartments of the limousine, Lieutenant Murray testified that "it was very obvious that the fire had originated from the area of the engine compartment." (*Id.* at 18, 21-22, 35.)  Lieutenant Murray has never been certified for arson or fire investigation.  (*Id.* at 36.)

Lieutenant Murray testified that the fire chief, who was also at the scene, made the call not to conduct further formal investigation into the fire by calling in arson investigators.  (*Id.* at 9.)  He explained that "because of the damage we were unable to tell what caused the fire itself, but as far as where it was confined to and the origin of the fire[, it] was pretty cut and dry in our minds so we didn't think we needed an inspector to come out and to investigate to determine any more than that."  (*Id.*)

Subsequently, Michigan Millers (Avon's property insurer) and Lancer (Pete's Limousine's no fault insurer) jointly hired Gery Victor, a certified fire investigator from EFI Global, to conduct a fire origin and cause investigation.  (Victor Aff. ¶¶ 8-9, Pl.'s Mot. Ex. 6.)  In conducting the investigation, Mr. Victor inspected the vehicle (which had been towed elsewhere), spoke with the owner of Pete's Limousine and with Lieutenant Murray, and viewed surveillance footage of the garage space captured by video cameras located therein.  (*Id.* at ¶ 17.)  Upon completion of the investigation, Mr. Victor produced a Fire Investigation Report.

4

This report states that "[t]he cause of this fire is undetermined." (Fire Investigation

Report 8, Pl.'s Mot. Ex. 7.)  However, the report explains:

> Fire pattern analysis indicates that the fire originated in the engine
> compartment of the vehicle.  Evidence indicates ignition result from
> an undetermined electrical failure.  Evidence indicated first fuel
> ignited consisted of undetermined combustibles.  Events bringing
> ignition and fuel together include combustible too close to heat
> source.

(*Id.*)  A surveillance camera located inside of the garage area corroborated the

fire's origin.  (*Id.* at 7 (explaining images from video footage and indicating that

"The video displayed the reflection of a fire developing slowly under the hood.

The video initially showed light smoke, then concentrated smoke at the driver's

side rear corner of the hood. . . .").)

　　　　Although the fire was mostly confined to the white limousine, the rest of the

building, including an adjacent unit, sustained smoke and water damage.  (*Id.* at 8;

Murray Dep. 24, Def.'s Mot. Ex. 2.)  Ultimately, Michigan Millers paid out in

excess of $200,000 to its insured, Avon, for the losses occasioned by the fire.[1]

Thereafter, Michigan Millers filed the instant subrogation action against Lancer in

---

[1] There is some discrepancy between the total dollar amount paid in
connection with the accident involved in this case.  Michigan Millers' Brief in
Support puts the figure at $248,807 while its Reply Brief indicates a payout of
$212,827.29.  (Pl.'s Br. 3; Pl.'s Reply 7.)  The figure changes (yet again) to
$243,807 in Michigan Millers' Sur-Reply.  (Pl.'s Sur-Reply 1.)  These
discrepancies, as well as the dispute regarding whether Michigan Millers paid its
insured for lost income and what that income consisted of, preclude summary
judgment on the issue of damages.

the Circuit Court for the County of Oakland, Michigan.[2]  (Compl. attach. Notice of Removal, ECF No. 1.)

On July 2, 2013, Lancer removed the action to this Court on the basis of diversity jurisdiction.   28 U.S.C. §§ 1332, 1441, 1446.  On December 19, 2013, after engaging in discovery, Michigan Millers filed a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.  (ECF No. 8.)  Lancer responded to the motion on January 9, 2014, (ECF No. 10), and Michigan Millers replied on January 23, 2014, (ECF No. 11).  Prior to the dispositive motion deadline of January 31, 2014, Lancer filed a cross motion for summary judgment. (ECF No. 12.)  Michigan Millers responded on February 20, 2014, (ECF No. 13), and Lancer replied thereto on March 5, 2014, (ECF No. 14).

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 instructs courts to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A court assessing the appropriateness of summary judgment asks "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co*., 323 F.3d 386, 390 (6th Cir. 2003)

---

[2] The Michigan Millers Insurance Policy contains an express subrogation provision.  (Pl.'s Reply 6 (citation to Policy, attached as Exhibit 11, omitted).)

6

(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986)).

Courts evaluate cross motions for summary judgment under the same standard. *La Quinta Corp. v. Heartland Props., L.L.C.*, 603 F.3d 327, 335 (6th Cir. 2010) (citing *Beck v. City of Cleveland*, 390 F.3d 912, 917 (6th Cir. 2004)). When faced with cross motions for summary judgment, each motion is examined on its own merits. *Id.*

### III.      ANALYSIS

### A.    Applicable Law

This Court has jurisdiction over the present dispute on the basis of diversity of citizenship. 28 U.S.C. § 1332. Pursuant to the *Erie* doctrine, Michigan law therefore governs the substantive issues raised herein. *Erie R.R. v. Tompkins*, 304 U.S. 64, 78, 58 S. Ct. 817, 822 (1938) ("Except in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case [involving diversity jurisdiction] is the law of the State.").

Michigan's Motor Vehicle, Personal and Property Protection Act, Michigan Compiled Laws § 500.3101 *et seq.*, more commonly referred to as the "No Fault Act," provides the pertinent legal framework for the instant action. The No Fault Act requires motor vehicles registered in the State of Michigan to "maintain security for payment of benefits under personal protection insurance, property

7

protection insurance, and residual liability insurance."  Mich. Comp. Laws §
500.3101(1).

This case involves only property protection insurance.  In this regard, the
Act provides:

> Under property protection insurance an insurer is liable to pay benefits
> for accidental damage to tangible [(non-vehicular)] property *arising
> out of* the *ownership, operation, maintenance, or use of a motor
> vehicle as a motor* vehicle subject to the provisions of this section and
> sections 3123, 3125, and 3127. . . .

*Id.* § 500.3121(1) (emphasis added).  As the commonly used name of the statute
implies, "[p]roperty protection insurance benefits are due under the conditions
stated in this chapter without regard to fault."  *Id.* § 500.3121(2).  "Damage to
tangible property consists of physical injury to or destruction of the property and
loss of use of the property so injured or destroyed."  *Id.* § 500.3121(3).

The No Fault Act also provides the order of priority for those suffering
property damage:

> A person suffering accidental property damage shall claim property
> protection insurance benefits from insurers in the following order of
> priority: insurers of owners or registrants of vehicles involved in the
> accident; and insurers of operators of vehicles involved in the
> accident.

*Id.* § 500.3125.  Thus, when tangible property is damaged by a motor vehicle
within the meaning of § 500.3121, the insurance company covering the owner or

registrant of the vehicle involved in the accident is primarily responsible for the
loss.

**B.      Did Property Damage Arise out of the Ownership, Operation,
         Maintenance, or Use of a Motor Vehicle as a Motor Vehicle?**

*1.   Does a Genuine Dispute of Material Facts Exist as to the Cause of the
      Fire such that Summary Judgment is Improper?*

Lancer argues that there exists a genuine dispute of material fact concerning
the cause of the fire because neither the Incident Report prepared by Lieutenant
Murray of the Rochester Hills Fire Department nor the Fire Investigation Report
prepared by Mr. Victor state with specificity how or why the fire started.  (Def.'s
Resp. 22.)  The Court is not persuaded.

While there is certainly a difference between the cause of a fire and the
origin of a fire, Lancer's argument is misplaced.  A dispute over a material fact is
genuine if, and only if, "the evidence is such that a reasonable jury could return a
verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.
Although it is true that neither Lieutenant Murray nor Mr. Victor could identify the
exact cause of the fire, the evidence in this case clearly establishes that the fire
originated in the engine compartment of the vehicle.  The Fire Investigation Report
provides the following explanation for the fire:

> Fire pattern analysis indicates that the fire originated in the engine
> compartment of the vehicle.  Evidence indicates ignition result from
> an undetermined electrical failure.  Evidence indicated first fuel
> ignited consisted of undetermined combustibles.  Events bringing

9

> ignition and fuel together include combustible too close to heat
> source.

(Fire Investigation Report 8, Pl.'s Mot. Ex. 7.)   Contrary to Lancer's suggestion, the precise component in the engine compartment causing the fire is irrelevant given the conclusions reached Mr. Victor.

In other words, while the record is devoid of a definitive explanation of the fire's cause, there is simply no dispute that the fire originated in the engine compartment of the white limousine.  Because all of the evidence before the Court points to something in the engine compartment as the cause of the fire and because there is no evidence that anything other than the limousine caused the fire, no reasonable trier of fact could find in favor of Lancer on this issue.  *Mich. Mut. Ins. Co. v. CNA Ins. Cos.*, 181 Mich. App. 376, 382, 448 N.W.2d 854, 856-57 (Mich. Ct. App. 1989) (per curiam).

Since there is no *genuine* dispute about the facts, "the issue whether an injury arose out of the use of a vehicle is a legal issue for a court to decide and not a factual one for a jury."[3]  *Putkamer v. Transamerica Ins. Corp. of Am.*, 454 Mich. 626, 630, 563 N.W.2d 683, 685 (1997) (citations omitted).

### 2.     *Is Plaintiff Entitled to Judgment as a Matter of Law on the Issue of Whether the Property Damage Arose out of the Ownership,*

---

[3] As a result of this rule, Lancer's suggestion that the Court is bound by Lieutenant Murray's deposition testimony that the vehicle was not in use and not being operated on is simply unavailing.  (Def.'s Br. 7 (citations to deposition transcript omitted).)

### *Operation, Maintenance, or Use of a Motor Vehicle as a Motor Vehicle?*

A major point of contention between the parties is whether the damage caused by the vehicle fire arose out of the ownership, operation, maintenance, or use of a motor vehicle as a motor vehicle as required by Michigan Compiled Laws § 500.3121(1).[4]   Michigan Millers argues that the white limousine's "connection with the damage is directly related to its character as a motor vehicle."  (Pl.'s Br. 6.)  Conversely, Lancer contends that the fire had no connection to the ownership, operation, maintenance, or use of a motor vehicle as a motor vehicle because the white limousine was parked in the leased commercial garage space for three days prior to the fire.  (Def.'s Resp. 4.)  Lancer's argument is rooted in Michigan Supreme Court case law holding that "whether an injury arises out of the use of a motor vehicle 'as a motor vehicle' turns on whether the injury is closely related to the transportational function of automobiles."  *McKenzie v. Auto Club Ins. Ass'n*, 458 Mich. 214, 215, 580 N.W.2d 424, 425 (1998) (interpreting "as a motor vehicle" language in relation to personal injury protection benefits).  This Court is

---

[4] "The words 'arising out of' have been viewed as words of much broader significance than 'caused by', and have been said to mean 'originating from', 'having its origin in', 'growing out of' or 'flowing from', or in short, 'incident to' or 'having connection with' the use of the car." *Johnston v. Hartford Ins. Co.*, 131 Mich. App. 349, 357-58, 346 N.W.2d 549, 553 (Mich. Ct. App. 1984) (quotation, citations, and internal quotation marks omitted).

of the opinion that Lancer's reliance on *McKenzie* is misplaced and that Michigan

Millers has the more persuasive argument on this point.

   In *McKenzie*, the Michigan Supreme Court addressed "the issue [of] whether

plaintiff is entitled to personal injury protection (PIP) benefits under the no-fault

act, . . . for injuries sustained when he was nonfatally asphyxiated while sleeping in

a camper/trailer attached to his [insured] pickup truck." *Id.* at 215, 580 N.W.2d at

424-25.  Like the property protection benefits at issue in this case, the receipt of

PIP benefits hinges upon whether the injury arose from the use of a motor vehicle

as a motor vehicle.  Mich. Comp. Laws § 500.3105(1).[5]  In holding that the no

fault insurer was entitled to summary disposition, the Michigan Supreme Court

explained that "[u]se of a motor vehicle as a sleeping accommodation is distinct

from and not closely related to the transportational function of a vehicle."

*McKenzie*, 458 Mich. at 223, 580 N.W.2d at 428.  This Court is not convinced that

*McKenzie* is analogous to the situation here because parking is "closely related to

the transportational function of a vehicle."  *Id.*

   While analyzing the arguments raised by the parties in *McKenzie*, the court

noted that "[a]s a matter of English syntax, the phrase 'use of a motor vehicle "as a

_____

      [5] Michigan Compiled Laws § 500.3105(1) provides:

      Under personal protection insurance an insurer is liable to pay benefits
      for accidental bodily injury arising out of the ownership, operation,
      maintenance or use of a motor vehicle as a motor vehicle, subject to
      the provisions of this chapter.

motor vehicle"' would appear to invite contrasts with situations in which a motor vehicle is not used 'as a motor vehicle.'  This is simply to say that the modifier 'as a motor vehicle' assumes the existence of other possible uses and requires distinguishing use 'as a motor vehicle' from any other uses."  *Id.* at 218, 580 N.W.2d at 426.  In other words, some motor vehicles, such as the parked camper/trainer involved in *McKenzie*, are fairly described as dual-purpose vehicles.  Examples of dual-purpose vehicles, as articulated in *McKenzie*, include motor vehicles used for purposes such "as a housing facility of sorts, as an advertising display (such as at a car dealership), as a foundation for construction equipment, as a mobile public library, or perhaps even when a car is on display at a museum."  *Id.* at 219, 580 N.W.2d at 426.  When used for the aforementioned purposes, "the use of a motor vehicle would not be 'as a motor vehicle,' but as a housing facility, advertising display, construction equipment base, public library, or museum display[.]"  *Id.*  It was in this context that the *McKenzie* Court explained that when analyzing whether a vehicle is being used as a motor vehicle, courts should "determine if the vehicle is being used for transportational purposes."  *Id.*; *see also Johnston v. Hartford Ins. Co.*, 131 Mich. App. 349, 360, 346 N.W.2d 549, 554 (1984) (discussing dual-function units and opining that the intent of the "as a motor vehicle" language was to restrict coverage to "motor vehicles whose function at the time of the accident was one compatible with that of a motor vehicle").

13

Contrary to Lancer's argument, this Court disagrees that the property damage at issue herein did not arise out of the ownership, operation, maintenance, or use of a motor vehicle as a motor vehicle under the analysis set forth in *McKenzie*. "This case is unlike those circumstances identified in *McKenzie* as rare instances 'when a motor vehicle is used for other purposes, e.g., as a housing facility of sorts, as an advertising display (such as at a car dealership), as a foundation for construction equipment, as a mobile public library, or perhaps even when a car is on display at a museum.'" *Drake v. Citizens Ins. Co. of Am.*, 270 Mich. App. 22, 26, 715 N.W.2d 387, 390 (Mich. Ct. App. 2006) (quoting *McKenzie*, 458 Mich. at 219, 580 N.W.2d at 426). The white limousine involved in this case is not fairly characterized as a dual-purpose vehicle and there is therefore no need to distinguish its use as a motor vehicle from any other possible use. *McKenzie*, 458 Mich. at 218, 580 N.W.2d at 426. Indeed, the white limousine was used for the very purpose of transporting clients from one place to another. (Lazareanu Aff. ¶ 3, Def.'s Mot. Ex. 1.)

That the vehicle was parked at the time of the fire does not detract from its singular transportational function. "While a vehicle need not be in motion at the time of an injury in order for the injury to 'arise out of the use of a motor vehicle as a motor vehicle,' the phrase 'as a motor vehicle' does require a general determination of whether the vehicle in question was being used, maintained, or

14

operated for transportational purposes." *Drake*, 270 Mich. App. at 26, 715 N.W.2d at 390 (citations omitted).  Here, it is without question that the vehicle was being used for transportational purposes.  As a matter of logic, parking is a necessarily corollary of motoring.  Parking, then, "is closely related to the transportational function of a vehicle." *McKenzie*, 458 Mich. at 223, 580 N.W.2d at 428.  Unlike the conclusion that sleeping in the parked camper/trailer was "too far removed from the transportational function to constitute use of the camper/trailer 'as a motor vehicle' at the time of the injury[,]" *id.* at 226, 580 N.W.2d at 429, this Court is unable to conclude that the engine compartment fire giving rise to the property damage in this case is too attenuated from the ownership and use of the white limousine as a motor vehicle.

Further, to the extent Lancer argues that there is no evidence in the record to support a finding that anyone intended to use the vehicle for transportational purposes, the argument is lacking in merit.[6]  The owner of Pete's Limousine

---

[6] Lancer does not endeavor to explain why it has interjected the issue of intent, however, this Court has found case law to support the relevancy of intent. *Compare Putkamer v. Transamerica Ins. Corp. of Am.*, 454 Mich. 626, 563 N.W.2d 683 1997) (holding that plaintiff was injured by use of a motor vehicle as a motor vehicle when she slipped and fell as she was getting into a parked vehicle because she intended to get into the vehicle to drive to another location) *with Dinkins v. State Farm Mutual Auto. Ins. Co.*, No. 307363, 2012 Mich. App. LEXIS 2550 (Mich. Ct. App. Dec. 13, 2012) (unpublished) (per curiam) (holding that plaintiff injured while removing items from her motor vehicle's trunk was not injured while using the motor vehicle as a motor vehicle because she was unable to

15

submitted an affidavit attesting that "[t]he next scheduled use of the limousine was for New Year's Eve, December 31, 2012." (Lazareanu Aff. ¶ 8, Def.'s Mot. Ex. 1.) Thus, while the vehicle was being temporarily stored, there was a clear intent to use the limousine as a form of transportation two days after the fire. Further, although Lancer repeatedly argues that the vehicle had not been driven for approximately one week prior to the fire, the same affidavit provides that "[t]he limousine was last driven on December 26, 2012[,]" a mere three days prior to the fire. (*Id.* at ¶ 7.)

The Court's conclusion that the property damage arose out of the ownership or use of the limousine as a motor vehicle, is supported by an unpublished case from the Michigan Court of Appeals.[7] *State Farm Fire & Cas. Co. v. Auto-Club Ins. Ass'n*, No. 194426, 1998 WL 1991209 (Mich. Ct. App. 1998) (unpublished) (per curiam). In *State Farm*, a truck driven by a homeowner's friend spontaneously caught fire while parked in the homeowner's carport, causing fire damage to the home. No. 194426, 1998 WL 1991209, at *1. The Michigan Court of Appeals affirmed the trial court's grant of summary disposition in favor of the

---

drive and could not have intended to use the motor vehicle for any transportational function).

[7] It is of course true that unpublished cases are not precedentially binding. However, the Court finds the case instructive and disagrees with Lancer that the decision was wrongly decided. In fact, the Court believes that *State Farm* is consistent with *McKenzie*'s transportational function test because the truck in that case, as with the limousine in this case, did not serve more than one function.

16

homeowner's insurer which, like Michigan Millers in this case, was seeking the recovery of benefits paid to the homeowner as the homeowner's subrogee.  *Id.* The "key issue" in *State Farm* was "whether the property damage arose out of the ownership of the motor vehicle insured by defendant in its capacity as a motor vehicle." [8]  *Id.* at *2.  In answering that question in the affirmative, the court indicated that "the qualitative characteristics of the truck which were the source of the fire are the key factors in the resulting fire damage.  In other words, the quality that made the vehicle a motor vehicle are what caused the property damage."  *Id.* These qualities or characteristics included that the vehicle was filled with flammable liquids, had a source of ignition (e.g., electrical wiring), and contained many flammable parts.  *Id.*  Additionally, "the truck was parked in the carport precisely because it was a motor vehicle." *Id.*

The similarities between the *State Farm* case and the instant action are quite striking.  The truck in *State Farm* ignited due to "some flaw in the dashboard/radio area within the truck.  There [was] no evidence suggesting an intervening cause." *Id.* at *3.  The same is true of the limousine, although, the flaw was in the engine

_____

[8] Although the court framed the "key issue" slightly differently than other courts evaluating that "as a motor vehicle" language, the Michigan Court of Appeals has recently noted that "the general concept of applying a test that focuses on the *transportational function* of a vehicle when considering *parked* vehicles seems illogical and, consequently, is, for all practical purposes, illogical."  *Drake v. Citizens Ins. Co. of Am.*, 270 Mich. App. 22, 38, 715 N.W.2d 387, 397 (Mich. Ct. App. 2006) (emphasis in original).

compartment as opposed to the dashboard/radio area.  While the facts between this case and *State Farm* differ with respect to how long the vehicles were parked, the Court hesitates to create a strict temporal component under Michigan's No Fault Act when the Michigan Court of Appeals was silent on the issue.

Moreover, the Court is persuaded by the rationale undergirding the *State Farm* Court's decision.   As the Michigan Supreme Court has observed in the context of personal injury protection, "[i]njuries involving parked vehicles do not normally involve the vehicle as a motor vehicle.  Injuries involving parked vehicles typically involve the vehicle in much the same way as any other stationary object (such as a tree, sign post, or boulder) would be involved."  *Putkamer*, 454 Mich. at 633, 563 N.W.2d at 687 (quotation omitted).  However, trees, sign posts, and boulders do not have electrical failures that cause spontaneous combustion.  *State Farm*, No. 194426, 1998 WL 1991209, at *3.

### 3.    *Is Plaintiff Entitled to Judgment as a Matter of Law on the Issue of Whether the Limousine was Involved in the Accident?*

Under the Michigan statute, an insurer may only be liable for property protection insurance benefits if the insured vehicle is "involved in the accident":

> A person suffering accidental property damage shall claim property protection insurance benefits from insurers in the following order of priority: insurers of owners or registrants of vehicles *involved in the accident*; and insurers of operators of vehicles *involved in the accident*.

18

Mich. Comp. Laws § 500.3125 (emphasis added).  For a vehicle to be considered "involved in the accident" for purposes of this statute, it "must actively, as opposed to passively, contribute to the accident."  *Turner v. Auto Club Ins. Ass'n*, 448 Mich. 22, 39, 528 N.W.2d 681, 689 (1995).  "Showing a mere 'but for' connection between the operation or use of the motor vehicle and the damage is not enough to establish that the vehicle is 'involved in the accident.'"  *Id.* at 39, 528 N.W.2d at 689.  The active contribution requirement "guarantees that insurers will not be held liable for property protection benefits simply because of a remote association between their insureds' vehicles and the accident."  *Id.* at 42, 528 N.W.2d at 690.

    In an effort to frustrate a finding of causation entitling Michigan Millers to recover the funds it disbursed to Avon, Lancer argues that "parked vehicles are never 'involved in the accident' for property protection benefits under the No-Fault Act."  (Def.'s Br. 11.)  Lancer cites no case law in support of its proposition. Rather, this argument is predicated upon the fact that the Michigan Legislature created exceptions to the general rule that parked vehicles are not involved in accidents involving personal injury protection benefits.  *See* Mich. Comp. Laws § 500.3106.  While Lancer does employ traditional canons of statutory interpretation in its effort to persuade the Court of its position, the parked vehicle exceptions are included in a portion of the statute addressing only personal injury protection benefits.  *Id.* (provision titled "Accidental bodily injury arising out of

19

ownership, operation, maintenance, or use of parked vehicle as motor vehicle[]"). Therefore, the parked vehicle exceptions are irrelevant in this action seeking recovery of monies paid in connection with property damage. *State Farm*, No. 194426, 1998 WL 1991209, at *2 ("[T]he analysis in *Ford Motor Co* supports the conclusion that the parked vehicle exclusion in § 3106 only applies to personal injury cases.").

Stripped of the above argument, Lancer is unable to show that the white limousine was not "involved in the accident." This is not a case where the damage caused by the parked vehicle is analogous to an accident involving "any other stationary object (such as a tree, sign post, or boulder)[.]" *Putkamer*, 454 Mich. at 633, 563 N.W.2d at 687. The requisite causal nexus between the vehicle and the property damage surely exists in this case and the "association between" the vehicle and the property damage is far from "remote[.]" *Turner*, 448 Mich. at 41, 528 N.W.2d at 690.

**C.    Do the Terms of the Lease Agreement Take This Action Outside of the No Fault Act?**

Lancer argues that the insurance coverage provisions in the lease between Avon (Michigan Millers' insured) and Pete's Limousine (Lancer's insured) take this action outside of the No Fault Act and cites *Doss v. Citizens Insurance Company of America*, 146 Mich. App. 510, 381 N.W.2d 409 (Mich. Ct. App. 1985), as support. Without devoting too much time to this argument, the Court

notes that *Doss* is inapposite as it involved a priority dispute between two no-fault insurers.  In *Doss*, a gentleman died in a vehicle accident while driving a rented vehicle.  *Id.* at 512, 381 N.W.2d at 410.  At the time, the decedent owned a vehicle insured by Citizens but was driving a rental vehicle covered by a no fault policy issued by Liberty Mutual.  *Id.*  The court was called upon to decide which no fault insurer was responsible for paying survivors loss benefits.  *Id.*  In deciding this question, the court framed the issue as "whether an insurance company which would not be the primary insurer under the priority provisions of the no-fault statute can contract to provide primary coverage."  *Id.* at 409, 381 N.W.2d at 511.  After explaining that "Liberty Mutual's assumption of primary responsibility to provide the benefits in question does not directly conflict with the statute[,]" and that Liberty Mutual "expressly contracted to provide primary coverage," the court held that the trial court did not err in granting summary judgment to Citizens.  *Id.* at 410-11, 381 N.W.2d at 513-14.

In this case, the lease between Avon and Pete's Limousine (and Metro Party Bus) does provide that Avon will insure the premises.  However, unlike *Doss*, the lease agreement does not expressly reference no fault insurance.  Because the goal of the no fault statute is "to provide accident victims with prompt and adequate compensation" for injuries or damage arising from the use of a motor vehicle, *id.* at 410, 381 N.W.2d at 513-14, the Court is not convinced that this case is governed

21

by *Doss*. The No Fault Act mandates property protection coverage and provides an order of priority for persons seeking to recover funds for property damage caused by a motor vehicle. A finding that Avon implicitly assumed responsibility for property damage caused by a motor vehicle would be contrary to the purpose of the statute. Accordingly, the Court rejects Lancer's argument.

Lancer's final argument regarding the lease agreement involves the arbitration provisions contained therein. Lancer contends that because the lease contains a complete arbitration provision, Michigan Millers is precluded from bringing this action. The Court disagrees and addresses this argument only to point out that the cases cited by Lancer do not support the proposition for which they are cited.

## IV.   CONCLUSION AND ORDER

Having determined that the white limousine causing the property damage satisfies all of the causation requirements imposed by Michigan's No Fault Act, and having further rejected Lancer's suggestions that the lease agreement takes this case outside of the No Fault Act, the Court holds that Michigan Millers is entitled to summary judgment on the issue of liability. However, despite Michigan Millers' efforts to clearly set forth the amount of damages it seeks to recoup from Lancer, these efforts have not demonstrated the absence of disputed material facts. As such, Michigan Millers is not entitled to summary judgment on the issue of

damages and the Court will schedule a hearing to determine the proper damages award.

Accordingly,

**IT IS ORDERED** that Michigan Millers' Motion for Summary Judgment (ECF No. 8) is **GRANTED IN PART** (on the issue of liability) and **DENIED IN PART** (on the question of damages);

**IT IS FURTHER ORDERED** that Lancer's Motion for Summary Judgment (ECF No. 12) is **DENIED**.

Date:  May 30, 2014

                          s/PATRICK J. DUGGAN
                          UNITED STATES DISTRICT JUDGE

Copies to:

**Bruce N. Moss, Esq.**
**Stanley A. Prokop, Esq.**

23